United States District Court
Southern District of Texas
FILED

JUN 09 2025

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas
**ENTERED**
June 09, 2025
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| ROSA ANTONIA CAMACHO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:24-CV-0249 |
| | § | |
| FRANK BISIGNANO, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff ROSA ANTONIA CAMACHO seeks judicial review of a final decision by the Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") denying Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1]  Through her complaint (the "Complaint") (Dkt. No. 2), Plaintiff requests reversal of the final decision and remand for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  At issue is whether there is substantial evidence to support a determination by the Administrative Law Judge ("ALJ") as to Plaintiff's ability to engage in any work available in the national economy for purposes of the fifth step of the five-step sequential disability evaluation.  Plaintiff contends that the ALJ: (i) failed to establish the availability of "a significant range of other work" by identifying only a single occupation that matched Plaintiff's vocational skills; (ii) erred in finding that Plaintiff acquired transferable skills from her past relevant work; and (iii) improperly excluded evidence of Plaintiff's mental

---

[1] Originally filed against Martin O'Malley, the then-Commissioner of the SSA, this suit now proceeds with Frank Bisignano, Commissioner of the SSA, as the substituted party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

limitations. As to the first two contentions, Plaintiff challenges the ALJ's determinations insofar as they relate to the period after she reached 55 years of age.

Pending is the Commissioner's motion for summary judgment. (Dkt. No. 12). The Commissioner generally argues that the ALJ's RFC assessment and vocational findings comport with the relevant legal standards and are supported by substantial evidence. (*Id.* at 3-4). Plaintiff has filed a response to the motion. (Dkt. No. 13). The motion for summary judgment is now ripe for consideration.

This case was referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the parties' briefing, the record, and the relevant law, the Magistrate Judge RECOMMENDS that the Commissioner's motion for summary judgment (Dkt. No. 12) be GRANTED, that the Complaint (Dkt. No. 2) be DENIED, that the final decision of the Commissioner be AFFIRMED, and that this civil action be DISMISSED.

## I. SOCIAL SECURITY FRAMEWORK

### A. Five-Step Sequential Evaluation

Social Security is a program whereby the federal government, through the SSA, provides monetary benefits to eligible individuals with disabilities. *United States v. Froehlich*, 2011 WL 13286700, at *1 (C.D. Cal. Feb. 25, 2011). In determining whether a claimant is disabled and entitled to benefits, the SSA applies the five-step sequential process articulated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), which involves asking whether:

> (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the [SSA] regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work.

*Winterroth v. Comm'r of Soc. Sec.*, 2021 WL 5639618, at *5 (S.D. Tex. Dec. 1, 2021) (citing *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995) (per curiam)).

In assessing the first step, a finding that the claimant is participating in substantial gainful activity—or work that involves significant physical or mental activities and is done for profit—precludes a finding of disability. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1572, 416.920(a)(4)(i), 416.972.

If a claimant is not engaging in substantial gainful activity, the analysis proceeds to "step two," where it is determined whether the claimant has a medical impairment (or combination of impairments) that is "severe," or that significantly limits their ability to perform work activities. *Id.* §§ 404.1520(a)(4)(ii), (c), 404.1522, 416.920(a)(4)(ii), (c), 416.922. The impairment must have lasted or be expected to last for a continuous twelve-month period unless it is expected to result in death. *Id.* §§ 404.1509, 416.909.

At the third step, a determination that an impairment is of sufficient duration and meets or exceeds an impairment listed in the appendix to the applicable SSA regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, necessitates a finding of disability, such that the claimant is entitled to benefits, *id.* §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d). Considered as part of the "step three" determination are any mental impairments, or "the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520a(c)(3), (d)(1), (2), 416.920a(c)(3), (d)(1), (2). This evaluation, referred to as the psychiatric review technique ("PRT"), concerns a claimant's ability to do the following: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself. *Owen v. Astrue*, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011); 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

The degree of limitation in these areas is rated on a five-point scale: (i) none, (ii) mild, (iii) moderate, (iv) marked, and (v) extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). If the severity of the mental impairment meets or exceeds that of a mental disorder listed in the applicable appendix and the impairment is of sufficient duration, the claimant is disabled and entitled to benefits. *See id.* §§ 404.1520a(d)(2), (3), 416.920a(d)(2), (3).

If the third step is not satisfied, the analysis proceeds to "step four," where the claimant's "residual functional capacity," or "RFC," is assessed and it is determined whether the claimant can still perform the requirements of any past relevant work. *Id.* §§ 404.1520(a)(4)(iv), (e), (f), 416.920(a)(4)(iv), (e), (f). RFC refers to a claimant's ability to do physical and mental work activities on a regular and continuing basis despite any limitations from impairments. *Id.* §§ 404.1545, 416.945. A "regular and continuing basis" means eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). "Past relevant work is work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it[.]" 20 C.F.R. §§ 404.1560(b)(1) (2012), 416.960(b)(1) (2012). If the claimant's RFC allows them to complete past relevant work, then they are not disabled. *Id.* §§ 404.1520(a)(4)(iv), 404.1560(b)(3), 416.920(a)(4)(iv), 416.960(b)(3).

If a claimant cannot complete past relevant work, the analysis proceeds to the fifth and final step, where it is determined whether they can do any other work considering their RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), (g)(1), 416.920(a)(4)(v), (g)(1). A claimant's age, which is particularly relevant to the Complaint, is considered in terms of predefined categories. 20 C.F.R. §§ 404.1563, 416.963. For instance, a claimant aged 55 or older falls within the advanced age category, which is deemed to "significantly affect[ ] a

person's ability to adjust to other work" and subject to special rules. *Id.* §§ 404.1563(d), 416.963(e). If the claimant is unable to do any other work considering these factors, they are disabled. *Id.* §§ 404.1520(a)(4)(v), (g)(1), 404.1560(c)(1), 416.920(a)(4)(v), (g)(1), 416.960(c)(1). If the claimant can adjust to other work, they are not disabled. *Id.*

Although the claimant has the initial burden of proving disability, the burden shifts in the fifth step to the SSA to show that the claimant can perform work in the national economy. *Id.* §§ 404.1560(c)(2), 416.960(c)(2); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). To satisfy this burden, the SSA must produce vocational expert testimony or other similar evidence. *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986) (per curiam). The vocational expert will assess the effect of any limitation on a given range of work and then opine whether the claimant's RFC permits them to perform any substantial occupation within the range of work at issue. *Conaway v. Astrue*, 2008 WL 4865549, at *4 (N.D. Tex. Nov. 10, 2008); *see also* SSR 00-4P, 2000 WL 1898704, at *1-2 (Dec. 4, 2000). Where the claimant can perform all or substantially all the exertional requirements at a given range of work, the Medical-Vocational Guidelines, 20 C.F.R. § Pt. 404, Subpt. P, App. 2, govern the disability determination by the SSA. *Edwards v. Colvin*, 2014 WL 3797366, at *12 (S.D. Tex. July 30, 2014); *see* SSR 83-11, 1983 WL 31252 (January 1, 1983). If the SSA's burden is met, the burden then shifts back to the claimant to show that they cannot perform the alternate work. *Fields*, 805 F.2d at 1170.

Typically relied on by vocational experts is the Department of Labor's Dictionary of Occupational Titles (the "DOT"), which provides "standardized occupational information to support job placement activities[,]" or list descriptions of the requirements for different jobs in the national economy.[2] *Dictionary of Occupational Titles* at xv (4th ed. 1991); *see also* SSR 00-

---

[2] The two volumes of the DOT are available at www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (last visited October 31, 2024).

4P, 2000 WL 1898704, at *2; 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). Vocational experts regularly cite to the Specific Vocational Preparation (the "SVP") metric, which quantifies the time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, app. C (4th ed. 1991). SVP levels range from level 1, which indicates that average performance requires only a short demonstration, to level 9, which would require over 10 years of preparation. *Id.* While neither the vocational expert testimony nor the DOT is per se controlling for purposes of the five-step determination, *see Carey v. Apfel*, 230 F.3d 146, 147 (5th Cir. 2000), the testimony should generally be consistent with the occupational information in the DOT, *see* SSR 00-4P, 2000 WL 1898704, at *2.

In making disability determinations, the SSA considers medical opinions by medical sources, or licensed healthcare workers who work within the scope of their practice. *See* 20 C.F.R. §§ 404.1502(d), 404.1520c, 416.902(i), 416.920c. In assessing a medical opinion, the SSA considers five factors: (i) the supportability of the opinion; (ii) the consistency of the opinion with evidence from other medical sources in the record; (iii) the medical source's treatment relationship with the claimant; (iv) the specialization of the medical source regarding pertinent medical issues; and (v) other factors which tend to support or contradict the opinion. *Id.* §§ 404.1520c(c), 416.920c(c). The most important of these factors are supportability and consistency, such that, for claims filed on or after March 27, 2017, the SSA is required to explain its analysis regarding the same. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

## B. Review of Non-Disability Determinations

A claimant may seek reconsideration of an initial finding of non-disability. *See* 42 U.S.C. § 1395ff(b)(1)(A). If the denial is upheld on reconsideration, a claimant may request a

hearing before an ALJ, who will issue a written decision regarding the claimant's ostensible disability. *See* 20 C.F.R. §§ 404.929, 404.953(a), 416.1429, 416.1453(a). A claimant may then request review of the ALJ's decision by the Social Security Appeals Council (the "Appeals Council"). *Id.* §§ 404.967, 416.1467. If the Appeals Council denies a request for review or otherwise upholds an unfavorable decision by the ALJ, the claimant can seek judicial review in an appropriate federal district court. *See* 42 U.S.C. § 405(g); *see also id.* § 1395ff(b)(1)(A).

## II. ADMINISTRATIVE PROCEDURAL HISTORY

In February 2021, Plaintiff filed applications for DIB and SSI, respectively, under Title II and Title XVI of the Social Security Act. (*See* Dkt. No. 4-1 at 84, 90-92, 332). Through these applications, Plaintiff claimed that she was disabled since June 15, 2020, primarily due to diabetes, arthritis of the right hand, fatty liver disease, and depression. (*See id.* at 377).

In October 2021, the SSA denied Plaintiff's applications based on a finding that she was not disabled. (*Id.* at 90-91). Plaintiff sought reconsideration of the denial. (*Id.* at 129). In January 2023, the SSA affirmed its initial decision. (*Id.* at 98-115, 130-38). Plaintiff then requested a hearing before an ALJ. (*Id.* at 139-40).

The hearing was held in November 2023. (*Id.* at 56-83). Plaintiff was represented by counsel. (*See id.* at 58-59). During the hearing, Plaintiff testified regarding her ostensible disability. (*Id.* at 66-74). Iric Saldivar, a vocational expert, testified regarding Plaintiff's ability to complete hypothetical tasks and perform related employment duties. (*Id.* at 75-81).

On December 7, 2023, the ALJ issued a decision unfavorable to Plaintiff. (*Id.* at 36-47). The ALJ determined that Plaintiff: (i) had impairments not severe enough for a categorical determination of disability; (ii) retained the functional capacity for light work with limited use of her right-hand; (iii) could not perform past relevant work; (iv) could perform other work that

exists in significant numbers in the national economy; and (v) was not otherwise disabled through the date of the decision. (*Id.* at 41-47).

In April 2024, the Appeals Council denied Plaintiff's request for review (*id.* at 7-12), finding "no reason under [the] rules to review the [ALJ's] decision" (*id.* at 7). As a result, the decision by the ALJ became the final decision of the Commissioner. (*Id.*).

In June 2024, having exhausted her administrative remedies, Plaintiff filed for judicial review of the final decision. (Dkt. No. 1).

### III. EVIDENTIARY RECORD

#### A. **Hearing Testimony**

At the hearing before the ALJ, Plaintiff testified regarding her medical conditions, functional limitations, and work history. (Dkt. No. 4-1 at 66-74).

Plaintiff reported pain, numbness, and swelling in her hands, particularly the right hand, and indicated that medication proved ineffective in alleviating these symptoms. (*Id.* at 71-73). Plaintiff testified that her physician had recommended carpal tunnel surgery for her right hand. (*Id.* at 72-73). She also reported swelling in her legs, waist pain, and heart palpitations. (*Id.* at 73-74). Regarding her diabetes treatment, Plaintiff noted that, while she experienced some adverse side effects including nausea, vomiting, and changes to her vision, medication had generally been effective. (*Id.* at 73). As to her mental health, Plaintiff stated that her depression and anxiety substantially impaired her ability to perform daily functions. (*Id.* at 74).

On the matter of her work history, Plaintiff testified that she worked as a hotel housekeeper, largely performing cleaning and laundry duties. (*Id.* at 67-69). When she could no longer perform that job, Plaintiff transitioned to being a "provider," or home health aide, where

she assisted clients with meal preparation and feeding, personal hygiene, mobility within their house, and other daily care needs. (*Id.* at 69-71).

Saldivar, the vocational expert, also testified at the hearing. Saldivar classified Plaintiff's past relevant work as: (i) a composite occupation of a housekeeper, DOT 323.687-014—unskilled work at the light exertional level per the DOT but performed at a heavy-to-very-heavy exertional level, with an SVP level of 2—and a laundry aide, DOT 361.687-018—unskilled work at the medium exertional level per the DOT but performed at a heavy-to-very-heavy exertional level, with an SVP level of 2; and (ii) a home health aide, DOT 354.377-014—semi-skilled work at the medium exertional level per the DOT but performed at a heavy-to-very-heavy exertional level, with an SVP level of 3. (*See id.* at 75-76). He opined that an individual sharing Plaintiff's vocational factors and exertional limitations could perform the housekeeper component of the composite occupation but could not, otherwise, perform Plaintiff's past relevant work. (*See id.*).

As to other work available in the national economy, Saldivar identified three unskilled occupations at the light exertional level that an individual such as Plaintiff could perform: a price marker, DOT 209.587-034; a laundry sorter, DOT 361.687-014; and an office helper, DOT 239.567-010. (*Id.* at 76-77). He further opined that Plaintiff's past work as a home health aide yielded transferable skills, such as "the ability to use the special skill to attend to the needs of specific individuals, the ability to communicate effectively, [and] the ability to be able to respond to emergency situations[.]" (*Id.* at 77-78). Those skills would enable Plaintiff to work as a companion, DOT 309.677-010—semi-skilled work at the light exertional level, with an SVP level of 3—comprising approximately 400,000 jobs in the national economy, with minimal adjustment. (*Id.*).

**B. Medical Evidence**

Given the nature of Plaintiff's claims, the Magistrate Judge will review the medical evidence in the record only as it relates to Plaintiff's mental health. The available medical records reflect that, as of mid- to late-2021, Plaintiff had been diagnosed with major depressive disorder and generalized anxiety disorder (*see, e.g.*, Dkt. No. 4-1 at 552, 701, 736), and that she began receiving treatment, primarily through medication management, during the period at issue (*see, e.g., id.* at 1521). Notwithstanding the symptoms of depressed mood, episodes of uncontrollable weeping, and intermittent thoughts of passive suicidal ideation (*see, e.g., id.* at 1672, 1677), the examinations of her mental status demonstrated normal functioning in most of the assessed domains, including alertness, orientation, behavior, speech, affect, thought processes, thought content, risk of suicide and homicide, insight, judgment, memory, attention, and concentration (*see, e.g., id.* at 760-63, 970-72, 1016-17, 1026-27, 1518-19, 1623-24, 1684-85, 1708-09).

The state agency medical consultants, Dr. Michael Plasay and Dr. Karla Delcour, psychologists (*see id.* at 95, 103), conducted respective reviews of the then-available mental health evidence in the record at the initial and reconsideration stages of Plaintiff's applications (*id.* at 85, 93, 100, 108). Based on these reviews, the agency consultants opined that Plaintiff's clinical depression resulted in mild functional limitations across all four domains of the PRT assessment. (*Id.* at 86, 94, 102-03, 110-11).

## IV. DETERMINATION BY THE ALJ

In applying the first step of the sequential process described above, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the period under review, thereby satisfying the insured status requirements of the SSA. (Dkt. No. 4-1 at 38-39).

At step two, the ALJ determined that Plaintiff suffered from severe impairments, including diabetes mellitus, osteoarthritis of the right knee, and carpal tunnel syndrome of the right hand. (*Id.* at 39-40).

Moving to step three, the ALJ determined that Plaintiff's impairments did not meet or exceed the severity of those listed in the applicable appendix to the SSA regulations. (*Id.* at 41). In conducting the PRT analysis, the ALJ determined as follows:

> [Plaintiff's] medically determinable mental impairment of major depressive disorder [did] not cause more than minimal limitation in [her] ability to perform basic mental work activities and [was] therefore nonsevere. [Plaintiff was] prescribed medications . . . for symptoms of depression with reports of good symptom control. Aside from one notation in October 2022 when [Plaintiff presented] as unkempt, mental status exams [were] generally benign with full orientation, intact judgment and insight, normal memory, normal behavior and speech, and direct goal-oriented thoughts.

> In making this finding, the [ALJ] has considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 [C.F.R.,] Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

> The first functional area is understanding, remembering or applying information. In this area, [Plaintiff] ha[d] mild limitation. There is no evidence that [Plaintiff was] incapable of understanding terms, instructions, or procedures or following one to two step instructions. There is no evidence that [Plaintiff was] unable to recognize a mistake and correct it or to identify and solve a problem. At the hearing, [Plaintiff] was capable of asking and answering questions and providing adequate explanations. [Plaintiff] was capable of describing past work activity and job duties. Mental status exams [showed Plaintiff] to have intact memory, normal thought content, and normal thought processes.

> The next functional area is interacting with others. In this area, [Plaintiff] ha[d] mild limitation. [Plaintiff was] not limited to a greater degree in this area as there is no substantial evidence that [Plaintiff] lack[ed] a knowledge of standards of neatness and decorum. There is no substantial evidence that [Plaintiff] show[ed] significant signs of tangential/circumstantial thought, loose associations, homicidal ideation, excessive paranoia, or excessive hallucinations or delusions. [Plaintiff could] communicate clearly, demonstrate cooperative behaviors, and initiate and sustain at least some social contacts. At exams [Plaintiff] presented as cooperative, well groomed, and with normal behavior and speech. [Plaintiff]

ha[d] the ability to communicate about specific aspects of task-oriented employment and abide by the standards governing basic conduct and appearance that are predominant in many vocational environments.

The third functional area is concentrating, persisting or maintaining pace. In this area, [Plaintiff] ha[d] mild limitation. [Plaintiff was] not limited to a greater degree in this area, as [she had] demonstrated the ability to sustain focused attention sufficiently long to permit timely and appropriate completion of tasks commonly found in the work setting such as everyday household routines. [Plaintiff could] work at a consistent pace until a task [was] completed and demonstrated the ability to repeat sequences of action to achieve a goal or objective. Testifying at the hearing, [Plaintiff] followed the proceedings and stayed on point. At mental status exams she [had] exhibited good insight and judgment with logical and coherent thought processes.

The fourth functional area is adapting or managing oneself. In this area, [Plaintiff] ha[d] mild limitation. [Plaintiff could] care for personal hygiene and maintain appropriate attire. [Plaintiff did] not engage[ ] in self-injurious behavior and [was] aware of hazards. [Plaintiff was] capable of controlling their moods and [did] not experience[ ] any outbursts or episodes of inappropriate behavior that would interrupt a work setting. [Plaintiff did] not require[ ] any inpatient psychiatric treatment. [Plaintiff could] perform chores, cook, and manage their household. There is no compelling evidence to suggest that [Plaintiff's] capacity to appreciate/adhere to occupational safety guidelines, secure transportation to a jobsite, or do basic planning for work activities [was] especially limited by a mental impairment.

Because [Plaintiff's] medically determinable mental impairment cause[d] no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there [was] more than a minimal limitation in [her] ability to do basic work activities, it is nonsevere.

(*Id.* at 39-40 (emphasis in original) (citations omitted)).

Based on the severity determinations, the ALJ moved to step four and determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with the exception that fingering with the right hand is limited to a frequent level. (*Id.* at 41-45). For reference, "light work" refers to work that involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). While "the weight lifted may be very little," light work may "require[ ] a good deal of walking or

standing," or "involve[ ] sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* An individual is "capable of performing a full or wide range of light work" if they can "substantially" perform all associated activities. *Id.* Also, unless there are further limiting factors, an individual capable of light work is also capable of sedentary work. *Id.* Concerning the functional limitation, "fingering" involves picking, pinching, or other tasks performed primarily with the fingers, SSR 85-15, 1985 WL 56857, at *7 (January 1, 1985), and a task is deemed "frequent" when performed between one-third and two-thirds of an eight-hour workday, SSR 83-10, 1983 WL 31251, at *6 (January 1, 1983).

In determining that Plaintiff could perform such light work, the ALJ considered Plaintiff's medical records, the opinions of the agency consultants, and the hearing testimony. (*See* Dkt. No. 4-1 at 41-45). Concerning Plaintiff's mental impairments, specifically, the ALJ highlighted that the opinions of the agency consultants, who were "familiar with agency policy and procedure[,]" were "consistent with each other and [were] supported by the medical evidence of record as a whole, which show[ed] normal mental status exam findings." (*Id.* at 45).

The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained [elsewhere] in [the] decision." (*Id.* at 42).

Continuing with step four, the ALJ determined that Plaintiff could not perform past relevant work as a composite occupation of housekeeper and laundry aide or as a home health aide. (*Id.* at 45). In doing so, the ALJ primarily relied on the vocational expert testimony. (*See id.*; *see also id.* at 75-76).

At step five, the ALJ assessed Plaintiff's ability to perform other work existing in the national economy. The ALJ considered Plaintiff's RFC, in conjunction with her age, education, and work experience. (*Id.* at 45-47). The ALJ acknowledged that Plaintiff's age category had changed from "closely approaching advanced age"—ages 50 through 54—to "advanced age"—ages 55 and older—as defined in 20 C.F.R. §§ 404.1563, 416.963. (*Id.* at 45). As to education, the ALJ found that Plaintiff had limited education as defined in 20 C.F.R. §§ 404.1564, 416.964. (*Id.*). Most importantly, the ALJ determined that, based chiefly on vocational expert testimony, Plaintiff acquired vocational skills from her past relevant work as a home health aide that would be transferable to other occupations in the national economy, such as "the ability to use special skills to attend to individuals, the ability to communicate effectively, abilities to respond to an emergency situation, abilities to motion [sic] and feed special diets, and abilities to go with clients to medical and other appointments." (*Id.* at 46). The ALJ noted that these skills would transfer, with minimal vocational adjustment, to the work of a companion—which existed in approximately 400,000 positions nationally. (*Id.*). While Plaintiff's RFC did "not allow [her] to perform the full range of light work," the ALJ determined, "considering [these vocational factors,] a finding of 'not disabled' [was] appropriate under the framework of Medical-Vocational Rule 202.12 and Rule 202.03." (*Id.* at 46-47).

Accordingly, the ALJ concluded that Plaintiff was not disabled and denied her applications for DIB and SSI. (*Id.* at 47).

## V. STANDARD OF REVIEW

### A. Scope

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to two inquiries: (i) whether the decision is supported by substantial evidence; and (ii) whether

the Commissioner correctly applied the relevant legal standards. *Bednorz v. Comm'r of Soc. Sec.*, 2023 WL 5846804, at *2 (W.D. Tex. Sept. 11, 2023) (citing *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997) (per curiam)).

Evidence is substantial where it is more than a scintilla but less than a preponderance, such that a reasonable mind could accept it as adequate to support a conclusion. *Bessey v. Berryhill*, 2019 WL 1431599, at *2 (W.D. Tex. Mar. 29, 2019) (quoting *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam)) (quotations omitted). Substantiality, in this context, requires the weighing of four elements of proof: (i) objective medical facts; (ii) diagnoses and opinions of treating and examining physicians; (iii) the claimant's subjective evidence of pain and disability; and (iv) the claimant's age, education, and work history. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)). A reviewing court may not reweigh the evidence, try the issues de novo, or substitute their judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989) (per curiam)). All a court may do is scrutinize the record for substantial evidence supporting the Commissioner's decision. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)). A final decision of the Commissioner supported by substantial evidence must be affirmed. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (per curiam). A court may not find a lack of substantial evidence unless there is (i) a conspicuous absence of credible choices or (ii) no contrary medical evidence. *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (per curiam) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (per curiam)).

"Procedural perfection in administrative proceedings is not required[,]" and thus an administrative judgment will be vacated only where "the substantial rights of a party have been

affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). The procedural improprieties at issue must "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (per curiam). Otherwise, an error is harmless "when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (per curiam). Therefore, to establish error that warrants remand, a plaintiff must show that that the SSA's decision might have been different absent the error. *See Martinez v. Saul*, 2020 WL 5536814, at *17 (N.D. Tex. Aug. 31, 2020) (citing *Bornette*, 466 F. Supp. 2d at 816), *report and recommendation adopted sub nom. Martinez o/b/o Marquez v. Saul*, 2020 WL 5531485 (N.D. Tex. Sept. 15, 2020).

## B. **Remand**

A district court is authorized by 42 U.S.C. § 405(g) to remand a social security case to the Commissioner for further administrative action. *See Melkonyan v. Sullivan*, 501 U.S. 89, 101-02 (1991). This authorization is limited to that afforded by § 405(g)'s sentence four or sentence six. *Id.* "[R]emand orders must either accompany a final judgment affirming, modifying, or reversing the administrative decision in accordance with sentence four, or conform with the requirements outlined by Congress in sentence six." *Id.*

The fourth sentence of section 405(g) authorizes a district court to issue a remand order upon the pleadings and transcript of the record, either affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). A sentence-four remand is appropriate when the evidence on the record is insufficient to support the Commissioner's final decision and further fact-finding is necessary. *See Kleja v. Barnhart*, 220 F. Supp. 2d 1330, 1334-35 (M.D. Fla.), *aff'd*, 49 F. App'x 290 (11th Cir. 2002). Essentially, a sentence four remand is a determination

that the SSA erred in deciding to deny benefits. *Hoa Hong Van v. Barnhart*, 483 F.3d 600, 605 (9th Cir. 2007).

A sentence-six remand is a different kind of remand insofar as the district court does not affirm, modify, or reverse the Commissioner's decision; a case is remanded, rather, "because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Melkonyan*, 501 U.S. at 98.

## VI. ANALYSIS

### A. <u>Significant Range of Work</u>

Plaintiff contends that, for the period after she attained advanced age status, the ALJ failed to sufficiently support the conclusion that other work matching Plaintiff's vocational skills existed in the national economy. (Dkt. No. 7 at 2-5; Dkt. No. 13 at 1-3). According to Plaintiff, a finding of disability was warranted unless the evidence demonstrated that she possessed skills "readily transferable to a significant range of semi-skilled or skilled work" within her functional capacity in terms of section 202.00(c) of the SSA's Medical-Vocational Guidelines. (Dkt. No. 7 at 4 (citing 20 C.F.R. § Pt. 404, Subpt. P, App. 2 § 202.00(c))). More specifically, Plaintiff argues that the ALJ's identification of one occupation—a companion—failed to demonstrate a significant range of work. (*Id.* at 4-5). In support of her argument, Plaintiff relies on *Lounsbury v. Barnhart*, 468 F.3d 1111 (9th Cir. 2006). (*Id.* at 2-5).

For reference, in *Lounsbury*, the Ninth Circuit held that the language of section 202.00(c) required multiple occupations. *Lounsbury*, 468 F.3d at 1117. The Ninth Circuit reached this conclusion based primarily on the SSA's equating of the phrase "range of work" with "occupations existing at an exertional level" in Social Security Ruling 83-10. *Lounsbury*,

468 F.3d at 1117. The Ninth Circuit later affirmed this categorical rule in *Maxwell v. Saul*, 971 F.3d 1128 (9th Cir. 2020), holding that even two occupations were insufficient to constitute a significant range of work. *Id.* at 1132.

The Commissioner takes the position that section 202.00(c)'s significant-range-of-work requirement is functionally indistinguishable to the significant-number-of-jobs requirement found in 20 C.F.R. §§ 404.1566(b) and 416.966(b), which may be satisfied by a single occupation. (*See* Dkt. No. 12 at 8). The Commissioner relies on *Morris v. Colvin*, 2016 WL 4523238 (E.D. Tex. Aug. 30, 2016), a case out of the United States District Court for the Eastern District of Texas, where the plaintiff raised an identical challenge to the language of section 202.00(c). The court in *Morris* recognized some facial distinction between the "significant range of work" language in section 202.00(c) and the general "significant number of jobs" threshold, which applies to exertional levels other than light work, but nonetheless rejected the plaintiff's challenge. *See id.* at *4-5. In doing so, the *Morris* court specifically declined to adopt the Ninth Circuit's categorical requirement of multiple occupations for establishing a significant range of work, noting that several district courts within the Fifth Circuit have rejected such "bright-line standard." *See id.* at *4 (collecting cases).

Indeed, the Ninth Circuit's interpretation has not garnered support outside its jurisdiction. Notably, through the recent case of *Hamilton v. Commissioner of Social Security*, 98 F.4th 800 (6th Cir. 2024) (per curiam), the Sixth Circuit expressly rejected the categorical approach and held that a single occupation with many different types of jobs could constitute a significant range of work required under section 202.00(c). Identifying several infirmities in the analytical methodology employed in *Lounsbury*, the Sixth Circuit elaborated on its rejection:

> We respectfully disagree with [the Ninth Circuit's] approach. For starters, § 202.00(c) does not use the word "occupation." It uses the word "work." And the

Ninth Circuit did not attempt to determine what this word meant by invoking the "traditional tools" of interpretation. Instead, the court reflexively deferred to [Social Security Ruling 83-10] that read "work" as "occupation." That reasoning deviates from the Supreme Court's command that we attempt to determine what a regulation means on our own before adopting administrative guidance on the issue.

Next, the Ninth Circuit's approach also deviates from the [SSA's] current reading of the relevant regulations. Despite [claimant's] repeated reliance on Social Security Ruling 83-10, the [SSA] did not bother to cite that ruling's definition of "range of work" on appeal. To the contrary, its briefing affirmatively contradicted the ruling's definition. The [SSA] explained that § 202.00(c) "does not even contain the word 'occupation.'"

Lastly, the Ninth Circuit suggested that "*Congress* might have drafted § 202.00(c) to require only a 'significant number of jobs'" but that "it chose not to do so." Yet the [SSA]—not Congress—drafted the Medical[-]Vocational Guidelines. So the Ninth Circuit mistook an administrative agency for our legislative branch. Contrary to the Ninth Circuit's claim, moreover, Congress did bar a disability finding if an applicant could perform "*any*" type of "work" that existed "in *significant numbers*" in the country.

*Id.* at 809 (alteration and emphasis in original) (citations and bracketing omitted). For reference, the traditional tools of interpretation relied on by the Sixth Circuit includes the examination of "the text, structure, history, and purpose of a regulation." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). The Sixth Circuit also articulated a practical concern that would arise from the Ninth Circuit's categorical interpretation:

If . . . we interpret "work" to mean "occupation," we would set a subjective benchmark that requires an inquiry into which jobs fall into which occupations. That view could necessitate difficult line-drawing problems. Indeed, the Department of Labor's Occupational Outlook Handbook (a source on which the [SSA] relies) defines some occupations broadly and others narrowly. It, for example, lumps all "lawyers" together into a single occupation. But it divides "clerks" into many occupations, including general office clerk, information clerk, and material recording clerk. No reasonable reader of the word "work" in § 202.00(c) would conclude that a disability finding should rest on the level of generality at which an ALJ defines an "occupation." That view might force ALJs to treat applicants as disabled because they could switch to only one occupation— even if the occupation contained millions of available positions. And that view might force ALJs to treat other applicants as not disabled because they could

switch to three occupations—even when the occupations contained only a few thousand jobs each.

*Hamilton*, 98 F.4th at 807-08 (citations omitted).

Turning to its own analysis, the Sixth Circuit undertook a comprehensive examination of the regulatory language. After exploring three possible interpretations of the word "work," the Sixth Circuit determined that "work" referred to "jobs," reasoning as follows:

> [T]he regulatory context leaves no doubt that § 202.00(c) refers to "jobs." Recall that the Medical[-]Vocational Guidelines help the [SSA] decide whether applicants can perform other work at step five of its evaluation sequence. At that step, the regulatory scheme consistently equates "work" with "jobs"—not "occupations." The scheme expressly uses the word "jobs" as a synonym for the word "work." And it makes clear that "work exists in the national economy" as long as a "significant number of *jobs*" exist—even if all those jobs fall into "*one*" occupation. Since the [SSA] uses "work" to mean "jobs" in all other regulations discussing step five, the Medical[-]Vocational Guidelines are most naturally read to contain the same meaning.
>
> Other parts of the Medical[-]Vocational Guidelines likewise suggest that the inquiry focuses on the *jobs*—not the *occupations*—that applicants can undertake. One subsection, for example, notes that the [SSA] will not treat as disabled younger applicants who can perform light unskilled work because these applicants can adjust to "substantial numbers of unskilled *jobs*." Another suggests that "illiterate" "younger individuals" who can perform light work are not disabled because they have "the capability for substantial numbers of such *jobs*." It would be strange for other subsections within the Medical[-]Vocational Guidelines to turn on an applicant's ability to undertake a substantial number of other *jobs* but for § 202.00(c) to turn on the applicant's ability to undertake a substantial number of other *occupations.*
>
> A broader statutory point reinforces this conclusion. If we required proof that applicants could switch to three occupations even if millions of jobs existed in just one of them, we would risk putting this regulation on a collision course with the "plain language of the governing statute." The Social Security Act makes clear that applicants do not qualify as disabled simply because they cannot engage in their "previous work." To qualify as disabled, applicants instead must be unable to "engage in *any other kind* of substantial gainful work which exists in the national economy." [The claimant's] proposed rule—that ALJs should treat applicants as disabled unless they can work across three occupations—likely conflicts with this text. After all, it is hard to see how someone eligible to work at 64,000 jobs across two fields could not engage in "*any* other kind" of work.

* * *

> A contextual factor points the same way. If we interpret "work" to mean "job," we would set an objective marker tied to the employment positions that exist in this country.

*Id.* at 805-07 (alteration in original) (citations and bracketing omitted). Because the term "work" denotes "jobs," the Sixth Circuit thus held, a single occupation with many different types of jobs satisfies the "significant range of work." *See id.* at 805.

The Magistrate Judge deems the Sixth Circuit's reasoning persuasive. Indeed, examining the term "work" through multiple interpretive lenses—such as its congruence with the function of section 202.00(c), the language of the related provisions within the Medical-Vocational Guidelines, the broader purpose of the Medical-Vocational Guidelines in promoting uniformity and efficiency in disability determinations, the regulatory framework governing the step-five determination, and the overall disability determination scheme as Congress intended—compels the conclusion that the term refers to "jobs." Accordingly, the occupation of companion, which Plaintiff could perform, with approximately 400,000 jobs in the national economy constituted a significant range of work set forth in section 202.00(c) of the Medical-Vocational Guidelines.

For these reasons, the Magistrate Judge concludes that the ALJ did not err in determining that Plaintiff could adjust to other work for purposes of the SSA's disability determination.

## B. Skills

Plaintiff contends that, for the period after she attained advanced age status, the ALJ erred by identifying basic work activities Plaintiff performed in her past relevant work as skills transferable to other semi-skilled or skilled work. (Dkt. No. 7 at 2, 6-9; Dkt. No. 13 at 3-4). Again, based on the vocational expert testimony, the ALJ determined that Plaintiff, through her past work as a home health aide, acquired transferable skills, such as "the ability to use special

skills to attend to individuals, the ability to communicate effectively, abilities to respond to an emergency situation, abilities to motion [sic] and feed special diets, and abilities to go with clients to medical and other appointments." (Dkt. No. 4-1 at 46). According to Plaintiff, these abilities constituted mere "basic 'abilities and aptitudes necessary to do most jobs[ ]'" (Dkt. No. 7 at 8 (citing 20 C.F.R. §§ 404.1522(b), 416.922(b)), rather than transferable skills for purposes of step five (*see id.* at 6 (citing SSR 82-41, 1982 WL 31389, at *2 (January 1, 1982))). Plaintiff further argues that the abilities were not transferable skills insofar as they were "easily learned or common between [sic] many industries" and not "trade or industry specific[.]" (*Id.* at 8). Plaintiff contends that the vocational expert testimony, which characterized basic abilities or aptitudes as skills, was "not consistent with [the] SSA's own policy[,]" and could not, therefore, serve as a proper basis for the related determination by the ALJ. (*Id.*).

For reference, Social Security Ruling 82-41, on which Plaintiff's argument primarily relies, defines a skill as—

> [the] knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn). It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner. This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery. A skill gives a person a special advantage over unskilled workers in the labor market.

SSR 82-41, 1982 WL 31389, at *2. Simply put, a skill is "a specific and articulable learned ability." *Muehling v. Colvin*, 2013 WL 1194078, at *3 (N.D. Tex. Mar. 6, 2013) (citing 20 C.F.R. § 404.1565(a)), *report and recommendation adopted*, 2013 WL 1197740 (N.D. Tex. Mar. 25, 2013). For instance, "[t]aking and recording a person's temperature, pulse and respiration, and the ability to type, file, tabulate, and post data in record books" are considered skills. *Id.*

(citing SSR 82-41, 1982 WL 31389, at *3). A skill is transferable when the skilled or semi-skilled work activities the claimant performed in their past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. *Id.* (quoting 20 C.F.R. § 404.1568(d)(1)) (quotations omitted). On the other hand, "an aptitude is an 'inclination, a natural ability, talent, or capacity for learning[,]'" *id.* (quoting *Weaver v. Sec'y of Health & Hum. Servs.*, 722 F.2d 310, 311 (6th Cir. 1983)), such as "physical abilities to do certain things, manual dexterity, alertness, coordination, the ability to pay attention or concentrate, perceive details, and do a number of things at one time[,]" *id.* (collecting cases). Where an ability identified by an ALJ involves both an innate capacity common to most people, as well as learned components specific to a professional context, it may properly constitute a skill. *See Surkand v. Barnhart*, 2001 WL 1518292, at *4-5 (E.D. La. Nov. 28, 2001), *aff'd*, 51 F. App'x 483 (5th Cir. 2002) (per curiam); *see also Steiner v. Sec'y of Health & Hum. Servs.*, 859 F.2d 1228, 1232 (6th Cir. 1987) ("[An] ability may be innate, learned, or both.").

As a threshold matter, Plaintiff's notion of what constitutes a skill under Social Security Ruling 82-41 is fundamentally erroneous. Citing to this administrative ruling, Plaintiff contends that the abilities identified by the ALJ could not be transferable skills because they were "common between [sic] many industries" rather than "trade or industry specific[.]" (Dkt. No. 7 at 8). Social Security Ruling 82-41, however, does not require that a skill be unique to an industry. The ruling recognizes, instead, that certain skills may "have universal applicability across industry lines[.]" SSR 82-41, 1982 WL 31389, *6. Whether a skill is specific to an industry is irrelevant to its classification as a skill rather than an aptitude.

Nor is Plaintiff's argument that the abilities at issue were aptitudes, rather than skills, availing. Plaintiff identifies some innate components involved in these abilities, such as the

physical capacity for bathing another person and "hearing and speaking" (Dkt. No. 7 at 7-8), but she does not otherwise articulate how any of the identified abilities lacked any learned components that would qualify them as skills, *see Surkand*, 2001 WL 1518292, at *4-5. Indeed, the record demonstrates that these abilities incorporated learned components, such as the assessment and accommodation of each client's specific circumstances, limitations, and care requirements. The vocational expert's identification of transferable skills was based on his "education, training, and experience in placing [and] observing jobs[,]" as well as the evidence of Plaintiff's past work as a home health aide, which involved caring for individuals with special needs such as limitations in their mobility. (*See* Dkt. No. 4-1 at 64, 80-81). The vocational expert also explained, albeit briefly, that these abilities were transferable because, as a companion, "[y]ou've still got to be able to respond to an emergency situation. You've still got to monitor. You've still got to . . . feed if there's special diets[.]" (*Id.* at 79). Accordingly, the vocational expert testimony identifying the abilities at issue as transferable skills was not inconsistent with the SSA's regulations and properly served as evidence for purposes of the ALJ's related determination.

For these reasons, the Magistrate Judge concludes that the ALJ's determination regarding the transferable skills acquired from Plaintiff's past work is supported by substantial evidence.

## C. Consideration of Mental Limitations in RFC Determination

Plaintiff contends that the ALJ erred by failing to properly consider her mild mental limitations in determining her RFC. (Dkt. No. 7 at 3, 9-21; Dkt. No. 13 at 4-7). According to Plaintiff, insofar as the ALJ found mild limitations stemming from clinical depression as part of the PRT analysis, the ALJ was required to either incorporate those limitations into the RFC assessment or explain their omission. (Dkt. No. 7 at 9-16). Otherwise, Plaintiff argues that the

ALJ's use of "a boilerplate statement" failed to constitute sufficient consideration of the mental limitations or explanation for their omission from the RFC assessment. (Dkt. No. 13 at 6).

This argument is without merit. ALJs may properly exclude non-severe mental limitations from the RFC assessment where substantial evidence supports the PRT determinations that mental limitations do not significantly affect the claimant's capacity to perform work-related activities. *Jeansonne v. Saul*, 855 F. App'x 193, 196-98 (5th Cir. 2021) (per curiam). Here, again, the ALJ found that Plaintiff's mental impairment of major depressive disorder caused only mild limitations in her ability to: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage herself. (Dkt. No. 4-1 at 39-40). For each area, the ALJ pointed to record evidence reflecting the minimal limitation on Plaintiff's ability to do basic work activities. (*Id.*). During the RFC assessment, the ALJ determined that the PRT analyses of the agency consultants—indicating only mild limitations due to clinical depression—were "supported by the medical evidence of record as a whole, which show[ed] normal mental status exam findings." (*Id.* at 44-45). The ALJ then discounted a statement—attributed to Plaintiff's primary physician—that Plaintiff was "unable to concentrate, [was] forgetful, and ha[d] depressed moods, anxiety attacks, [and was] in despair[,]" on the basis that that the statement lacked "functionally relevant terms" and was "not supported by the medical evidence of record[.]"[3] (*Id.* at 45). Indeed, the record

---

[3] Although the ALJ attributed this statement to Dr. Jose L. Ledezma-Alvarez, a review of the record suggests that the statement was authored, not by the physician, but by Plaintiff as part of a standardized questionnaire. While the statement refers to Plaintiff in the third person (*see* Dkt. No. 4-1 at 1659) and appears in the record directly before Dr. Ledezma-Alvarez's medical source statement (*see id.* at 1660-61), these documents may be differentiated by distinct form identifiers appearing at the bottom left of their respective pages. The form identifiers suggest that the statement is part of a standardized questionnaire executed by Plaintiff to report her socio-economic status for disability claims with the Texas Health and Human Services. (*See id.* at 1659, 1663). Regardless, even assuming that the physician did author the statement, the question of authorship is immaterial insofar as the ALJ ultimately dismissed

evidence shows that Plaintiff generally exhibited normal functioning during the relevant period. (*See, e.g., id.* at 760-63, 970-72, 1016-17, 1026-27, 1518-19, 1623-24, 1684-85, 1708-09). The ALJ's determinations for purposes of the PRT analysis and related RFC assessment are supported by substantial evidence.

Moreover, following the step-two analysis of the severity of Plaintiff's mental impairment, the ALJ expressly stated, "[t]he following [RFC] assessment reflects the degree of limitation [the ALJ] has found in the 'paragraph B' mental functional analysis." (*Id.* at 40). This reference of the PRT findings, albeit succinct, effectively incorporated those findings into the RFC assessment insofar as the PRT analysis "closely examined several of [Plaintiff's] medical records" and "found no more than a mild limitation in any of the four broad areas of mental functioning set out in the disability regulations." *See Saucedo v. Kijakazi*, 2022 WL 789684, at *3, *5 (S.D. Tex. Feb. 25, 2022), *report and recommendation adopted*, 2022 WL 784476 (S.D. Tex. Mar. 15, 2022).

For these reasons, the Magistrate Judge concludes that the ALJ did properly consider Plaintiff's mild mental limitations in the RFC assessment.

## VII. CONCLUSION

### *Recommended Disposition*

For these reasons, the Magistrate Judge RECOMMENDS that the Commissioner's motion for summary judgment (Dkt. No. 12) be GRANTED, that the Complaint (Dkt. No. 2) be DENIED, that the final decision of the Commissioner be AFFIRMED, and that this civil action be DISMISSED.

---

the substance of the statement due to its lack of contextual relevance and inconsistency with the mental status examination findings. (*See id.* at 44-45).

*Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

DONE at McAllen, Texas this 9th day of June 2025.

J. SCOTT HACKER
United States Magistrate Judge